NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TAMARRA P., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY[1], M.B., *Appellees.*

No. 1 CA-JV 15-0020
FILED 9-10-2015

Appeal from the Superior Court in Mohave County
No. B8015JD201304046
The Honorable Richard Weiss, Judge

**AFFIRMED**

COUNSEL

Erika A. Arlington, Esq., PC, Flagstaff
By Erika A. Arlington
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda L. Adams
*Counsel for Appellee DCS*

---

[1]     Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety is substituted for the Arizona Department of Economic Security in this matter. *See* ARCAP 27. In the text of our decision, we refer to the agencies that were involved at the relevant times.

_____

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Andrew W. Gould and Judge Patricia A. Orozco joined.

_____

**S W A N N**, Judge:

**¶1**         Tamarra P. ("Mother") appeals the juvenile court's order terminating her parental rights to her son, M.B.  We affirm because reasonable evidence supports the termination order.

## FACTS AND PROCEDURAL HISTORY

**¶2**         In October 2013, the Arizona Department of Economic Security ("DES") filed a dependency petition alleging that Mother had neglected M.B. by: 1) failing to provide necessities of life; 2) abusing illegal substances; and 3) leaving M.B. in the care of her mother ("Grandmother").  DES alleged that Mother would place M.B. in Grandmother's care for extended periods of time with no notice and without providing for the child's care.

**¶3**         DES placed M.B. with Grandmother as a part of his safety plan.  But although Grandmother had been the primary care provider for M.B., she was not equipped to meet his needs.  She had a limited income, did not have a car, and could not purchase supplies.  Additionally, M.B. suffered a serious burn while in Grandmother's care.  For these reasons, M.B. was removed from Grandmother's care in October 2013.

**¶4**         In early November 2013, Mother was incarcerated for assaulting Grandmother.  Mother had gone to Grandmother's house and asked her for $40, but Grandmother refused because she believed that Mother was under the influence of illegal drugs.  Mother then grabbed Grandmother by her hair and pulled her into the bathroom.  When Grandmother tried to leave the bathroom, Mother slammed the door on her hand.  Mother then choked Grandmother until she could no longer breathe.  Then she slammed Grandmother's face into the wall and floor several times causing severe bruising on her eyes and face.  Then Mother sat on Grandmother and pinned her to the ground, obstructing her nose and mouth so she could no longer breathe.  Eventually Grandmother told Mother she would give her the money and Mother allowed Grandmother to leave the bathroom.  Later that evening, Mother went with Grandmother to an ATM to withdraw $40.  A neighbor contacted the police after seeing Grandmother's

injuries. Mother later admitted that she was "high out of [her] mind" at the time of the assault.

¶5 Mother was not offered reunification services while she was incarcerated. In January 2014, the court found M.B. dependent as to Mother. DES stated that Mother needed to engage in services including visits, parenting classes, substance-abuse treatment, and mental-health services. She also needed to demonstrate that she was "willing and able to provide for [M.B.]" and could "keep him safe."

¶6 Mother was released from jail on April 23, 2014, and was placed on probation. According to the case manager, once Mother was released from jail, it took her approximately two weeks to contact DES. The case manager also noted that when Mother was not in custody, she "attended minimal visitation with [M.B.]" and "[M.B] was very distant from his mother and doesn't seek comfort [from her]." Mother stated that "she doesn't care for [M.B.] when he is upset [and] that it's up to [Grandmother] to do so." According to the case manager, when Mother was out of custody, she "maintained minimal contact with [the] agency at best."

¶7 As a condition of her probation, Mother was placed in a sober-living facility, but was asked to leave the facility after a few days because of a disagreement with another resident. For two months after her release, Mother did not complete any random drug tests with the Department of Child Safety ("DCS") or with her probation officer. Then Mother was arrested again in June 2014, and she admitted to using opiates without a prescription. Mother was sentenced to 120 days in jail for violating the terms of her probation.

¶8 In July 2014, DCS filed a petition to terminate Mother's parental rights under A.R.S. § 8-533(B)(8)(b). DCS amended its petition in September 2014, alleging additional grounds for severance under A.R.S. § 8-533(B)(2) and (B)(3). Mother was released from jail in October 2014, and began living at Angel Manor, another sober-living facility. The matter proceeded to a contested severance hearing in November 2014.

¶9 At the start of the hearing, Mother moved to continue the hearing because she had only been out of jail for a few weeks and was just beginning her case plan. M.B.'s representative objected, stating that M.B. had been in out-of-home care for over one year and continuing the hearing would prevent potential adoptive placements from pursuing adoption. The state also objected. The court denied the motion.

¶10 The case manager testified that M.B. could not safely be returned to Mother's care because she failed to comply with agency services when she was not

in jail. She stated that once Mother was released from jail, she continually failed to submit to random drug testing. And although Mother never refused any services, she did not successfully complete any of the recommended services.

¶11 Mother testified that she completed a substance-abuse assessment but was not able to participate in any follow-up care because treatment was not available in jail. She also testified that when she was not in jail, she was able to participate in supervised visits with M.B. but did not participate in any other reunification services.

¶12 The court found by clear and convincing evidence that M.B. was less than three years old and had been in out-of-home placement for more than six months under A.R.S. § 8-533(B)(8)(b). The court stated that Mother had been incarcerated for all but the first week of this case and then 54 days between her first and second arrests. The court found that Mother was aware that certain programs, such as Narcotics Anonymous, existed in jail and she could have participated in those programs. The court found by clear and convincing evidence that although many services were not available while Mother was in jail, the department made diligent efforts to provide her with reunification services. The court also found by clear and convincing evidence that Mother substantially neglected or willfully refused to "engage in appropriate reunification services." The court concluded that "termination upon that ground would be in [M.B.'s] best interest."

¶13 The court found "with some hesitance" that Mother had neglected M.B. by failing to provide a safe environment and provide for "the necessities of life such that would have caused a danger or risk to [M.B.]."

¶14 The court found that "this record established that from sometime in the late teen years of [Mother]'s life that she became involved with a variety of drugs." The court also found that the use of drugs was mostly after M.B. was born and impacted Mother's ability to parent. Therefore, the court found by clear and convincing evidence that there was a history of chronic abuse of dangerous drugs and that there remain reasonable grounds to believe that this condition will continue for a prolonged indeterminate period of time. The court also found that DCS made reasonable efforts to provide Mother with rehabilitative services, and that termination on that ground was in M.B.'s best interests.

## DISCUSSION

¶15 To terminate a parent-child relationship, the juvenile court must find by clear and convincing evidence that at least one of the grounds set forth in A.R.S. § 8-533(B) exists, and must find by a preponderance of the evidence that severance is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005);

*Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). We accept the court's findings of fact unless they are not supported by any reasonable evidence, and we will affirm the severance order unless it is clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We conclude that reasonable evidence supported the juvenile court's finding of the statutory grounds for severance and its finding that severance was in M.B.'s best interests.

## I.     MOTHER'S MOTIONS TO CONTINUE

**¶16**          Without citing any legal authority and without referencing anything in the record, Mother argues that the trial court erred when it denied her motions to continue both before the severance hearing and at the hearing. She asserts that she should have been given more time to engage in reunification services because she had recently been released from jail, and that she needed more time to prepare for the severance hearing because the state "had added two significant allegations as grounds for the termination."[2]

**¶17**          "Motions to continue are addressed to the sound discretion of the trial court and its decision will not be reversed absent a clear abuse of discretion." *Yavapai Cnty. Juv. Action No. J-9365*, 157 Ariz. 497, 499 (App. 1988).

**¶18**          DCS amended its petition for termination on September 15, 2014. The severance hearing took place on November 3, 2014. The same counsel represented Mother throughout the entire dependency and severance process. Mother's counsel was familiar with the case and had sufficient time between the filing of the amended petition and the severance hearing to adequately prepare for the hearing.

**¶19**          Moreover, "[t]he court may enter orders, pending the hearing, as the court determines to be in the best interests of the child." Ariz. R.P. Juv. Ct. 64(E). M.B.'s representative opposed Mother's motion, arguing that M.B. had been in out-of-home care for over one year and continuing the hearing would be a detriment to him and would prevent potential adoptive placements from pursuing

---

[2]     Mother asserts that at the severance hearing, her counsel "indicated she had not gotten some documents." Although she does not cite anything in the record, we assume she is referring to counsel's statement at the beginning of the severance hearing that, "we don't have all the documents that the State was going to put in, which I did intend to use." However, the exhibits were soon brought to the courtroom. We therefore reject Mother's argument that she was unable to continue with the hearing because of a lack of documentary evidence.

adoption. Therefore, the court could have properly concluded that a continuance was not in M.B.'s best interests.

**¶20** On this record, the juvenile court did not abuse its discretion when it denied Mother's motions to continue.

II.      MOTHER SUBSTANTIALLY NEGLECTED OR WILLFULLY REFUSED TO REMEDY THE CIRCUMSTANCES THAT CAUSED M.B. TO BE IN OUT-OF-HOME PLACEMENT.

**¶21** Mother argues that there was no evidence presented at the hearing that she substantially neglected or willfully refused to remedy the circumstances that caused M.B. to be in out-of-home placement. Once again, without reference to anything in the record, Mother argues that she engaged in reunification services when she was not in custody and to the extent possible while in custody. She also asserts that DCS did not give her appropriate reunification services, but rather "gave Mother a list of referrals which she was unable to participate in due to her incarceration."

**¶22** Under A.R.S. § 8-533(B)(8)(b), DCS was required to prove by clear and convincing evidence that M.B. was under three years old, had been in out-of-home placement for six months or longer pursuant to court order, that DCS had made a diligent effort to provide appropriate reunification services to Mother, and that Mother had substantially neglected or willfully refused to remedy the circumstances that caused M.B. to be in out-of-home placement, including refusal to participate in reunification services. The evidence was sufficient to satisfy this burden of proof.

**¶23** At the time of the severance hearing, M.B. had been in DCS custody for over one year and was under three years old.

**¶24** At the time of severance, the circumstances that caused M.B. to be in out-of-home placement mostly revolved around Mother's drug use and her resulting inability to care for M.B. The case manager noted that Mother must attend parenting classes and must be able to "provide for the basic needs of her child and . . . provide for those needs on her own in a timely and appropriate manner." Mother was also required to participate in a substance-abuse assessment and in random weekly drug testing.

**¶25** The case manager sent a letter to Mother while Mother was incarcerated and identified what services she would be expected to participate in upon her release. She also visited Mother twice in jail. Mother was provided with "visitations, substance abuse, Arizona's Families FIRST, Westcare for domestic

violence and anger management." Mother did not successfully complete any of those services.

¶26 Although it is true that Mother was incarcerated for the majority of these proceedings, when she was released from jail the first time, it took her weeks to contact DES. The case manager also noted that Mother "ha[d] attended minimal visitation with [M.B.]" Additionally, Mother "failed to comply in completing an intake [with Mohave Mental Health] following her release from county jail." And in the two months after her first release, Mother had not completed any random drug tests with DCS or with her probation officer. The record makes clear that when Mother was not incarcerated, she had the opportunity to participate in reunification services and chose not to do so.

¶27 Mother's re-arrest and her imprisonment for violating her probation further support the conclusion that Mother was not willing or able to provide for the basic needs of M.B. in a timely and appropriate manner.

¶28 The evidence supports the court's finding that DCS made diligent efforts to provide services to Mother and that Mother had substantially neglected or willfully refused to remedy the circumstances that caused M.B. to be in out-of-home placement, including refusal to participate in reunification services. DCS "provided [Mother] with the time and opportunity to participate in programs designed to help her become an effective parent; it therefore fulfilled its statutory mandate. [DCS] is not required to provide every conceivable service or to ensure that a parent participates in each service it offers." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994)

III.    CHRONIC ABUSE OF DANGEROUS DRUGS

¶29 Under A.R.S. § 8-533(B)(3), DCS was required to prove that Mother was unable to discharge her parental responsibilities because of a history of chronic abuse of dangerous drugs or controlled substances, and that there were reasonable grounds to believe that the condition would continue for a prolonged indeterminate period. DCS was also required to show that it had made reasonable efforts to provide reunification services to Mother or that such efforts would have been futile. *Jennifer G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 450, 453, ¶ 12 (App. 2005). The evidence was sufficient to satisfy this burden of proof.

¶30 Mother testified that she had used illegal drugs on and off since she was 16 years old and that approximately one month after M.B. was born, Mother began "severe [drug] use" and started injecting herself with pain medication. Mother used methamphetamine before M.B. was born and started using it again around the time that M.B. turned two years old. She also testified that the last time

she used illegal drugs was just before her most recent arrest. Additionally, she admitted to violating her probation by using opiates without a prescription.

**¶31** Mother contends that her drug use "was recreational and was not chronic" and therefore the court erred when it terminated her parental rights. "[D]rug abuse need not be constant to be considered chronic." *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 377, ¶ 16 (App. 2010). Rather, chronic "indicates a condition that has existed or continued for a long time as opposed to being constant." *Id.* Additionally, even if Mother had maintained sobriety in the month between her second release from jail and the severance hearing, as she claims, the court had discretion to consider her current sobriety in view of her consistent inability to abstain from drug use and complete substance-abuse treatment when she was not in a custodial or structured setting. *See id.* at 378-79, ¶¶ 24-29.

**¶32** Mother also argues that the only evidence regarding whether her drug use would continue for a prolonged and indeterminate period was the case manager's testimony, and that no evidence was presented by an expert who was qualified to testify about Mother's drug-use patterns. However, Mother testified about most of her own illegal drug use, including that she had used methamphetamine and opiates.

**¶33** The record also indicates that Mother was provided with substance-abuse testing but did not complete any urinalysis tests in the two months between her first and second arrests. Mother also testified that when she was not in jail she participated in supervised visits with M.B. but did not participate in any other reunification services.

**¶34** Mother's own testimony about her "significant history of drug use, recent drug use, and failure to complete various reunification services was sufficient evidence to show that her drug abuse would continue for a prolonged, indeterminate period," *Raymond F.*, 224 Ariz. at 378-79, ¶ 26, and that DCS had made reasonable efforts to provide reunification services to Mother. Therefore, reasonable evidence supports the court's finding that severance was warranted under A.R.S. § 8-533(B)(3).

IV. NEGLECT

**¶35** Under A.R.S. § 8-533(B)(2), DCS was required to prove by clear and convincing evidence that Mother neglected M.B. or failed to protect him from neglect. Neglect is defined as "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(24)(a).

**¶36** Mother argues that the juvenile court erred when it terminated her parental rights based on neglect.

**¶37** "If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M.*, 203 Ariz. at 280, ¶ 3. Because clear and convincing evidence supports the grounds for severance under A.R.S. § 8-533 (B)(8)(b) and (B)(3), we need not address this claim.

## V.     BEST INTERESTS

**¶38** To show that severance was in M.B.'s best interests, the court was required to determine "how the child would benefit from a severance *or* be harmed by the continuation of the relationship," *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990), by considering and balancing the totality of the evidence, *Maricopa Cnty. Juv. Action No. JS-9104*, 183 Ariz. 455, 461 (App. 1995), *abrogated on other grounds by Kent K.*, 210 Ariz. 279. One relevant factor to the best-interests determination is whether the child would be at risk of abuse or neglect if placed in the parent's care. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 238, ¶ 27 (App. 2011); *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 80, ¶ 17 (App. 2005). Other relevant factors include (but are not limited to) whether an adoptive placement is immediately available, whether the existing placement is meeting the child's needs, and whether the child is adoptable. *Raymond F.*, 224 Ariz. at 379, ¶ 30.

**¶39** Without citing any legal authority and without reference to anything in the record, Mother argues that there was no testimony or assessment by a behavioral-health-services provider that M.B. would benefit from termination, and that "[t]here was no testimony that removing the child's mother from his life permanently would be more beneficial to the child than reunification."

**¶40** Expert testimony is not required to establish best interests and Mother misstates the state's burden in presenting best interests evidence. DCS is only required to present *credible* evidence (not expert testimony) demonstrating how the child would benefit from a severance *or* be harmed by the continuation of the relationship. *Lawrence R. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 585, 587, ¶ 8 (App. 2008).

**¶41** The case manager testified that M.B. could not safely be returned to Mother's care because she did not have appropriate housing, she failed to comply with agency services, and M.B. was still at risk for future abuse or neglect. She also testified that M.B. was adoptable, that he has been placed with a potential adoptive placement, and that severance was in his best interests because he is a very young child who needs a stable environment.

¶42        This evidence was sufficient for the court to find that severance was in M.B.'s best interests.

VI.    INEFFECTIVE ASSISTANCE OF COUNSEL

¶43        Again without citing to authority or referring to the record, Mother argues that she received ineffective assistance of counsel and was prejudiced by deficient representation. Mother asserts that her counsel failed "to elicit testimony regarding Mother's kites to the caseworker attempting to stay in contact" and failed to "ask Mother about her ability to have the child with her at Angel Manor at the time of trial."

¶44        A parent has a due-process right to the effective assistance of counsel at a severance hearing to ensure the fairness of the proceeding and the reliability of the result. *See John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 324, ¶ 14 (App. 2007). And "in severance proceedings, as in criminal cases, the 'ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 696 (1984)). We review legal and constitutional questions de novo. *State v. Moody*, 208 Ariz. 424, 445, ¶ 62 (2004).

¶45        Ordinarily, to prevail on a claim of ineffective assistance of counsel, a party must show: 1) that his or her attorney's performance was deficient and fell below prevailing professional norms; and 2) that the attorney's performance prejudiced him or her. *Strickland*, 466 U.S. at 687–88, 692. To establish prejudice, Mother must do more than show counsel's errors had some conceivable effect on the proceeding's outcome. *State v. Whalen*, 192 Ariz. 103, 110 (App. 1997). She must demonstrate "that counsel's alleged errors were sufficient to 'undermine confidence in the outcome' of the severance proceeding and give rise to a reasonable probability that, but for counsel's errors, the result would have been different." *John M.*, 217 Ariz. at 325, ¶ 18 (citations omitted).

¶46        Even assuming that Mother's counsel's performance was deficient, Mother has failed to show any resulting prejudice -- that but for her counsel's errors, the outcome of the proceedings would have been different. Assuming that by "kite" Mother refers to attempts at communication, she has not explained how such communications would have changed the outcome of the proceedings. Mother's behavior after her first release from jail demonstrated a refusal to participate in reunification services regardless of any messages she may or may not have sent to her case manager. Additionally, Mother has not demonstrated how the information about children being allowed at Angel Manor would have changed the outcome of the proceedings. And "proof of ineffectiveness must be a demonstrable reality not merely a matter of speculation." *State v. Tison*, 129 Ariz. 546, 556 (1981).

¶47 Mother has "provided no basis for us to conclude that the severance proceedings in this case were fundamentally unfair; that the result of the hearing is unreliable; or that, had counsel conducted h[er]self differently, the juvenile court would have reached a different result." *John M.*, 217 Ariz. at 325, ¶ 19.

¶48 Because Mother offers little more than speculation about the outcome of the proceedings and failed to even reference the record regarding the allegedly deficient conduct, she has failed to demonstrate that she has been prejudiced. Therefore, we find no merit to her claim that she received ineffective assistance of counsel.

**CONCLUSION**

¶49 For the foregoing reasons, we affirm the juvenile court's order severing Mother's parental rights.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama